# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4474 | **DATE** | 9/30/2003 |
| **CASE TITLE** | Housing Authority Risk Retention Group, Inc. vs. Chicago Housing Authority | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. The court grants Housing Authority Risk Retention Group, Inc.'s motion for judgment on the pleadings (Doc. 17-1), denies CHA's motion for judgment on the pleadings (Doc. 16-1), and grants CHA leave, within ten days, to submit an amended answer alleging that the Policies have not been validly filed, if it so chooses.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | SEP 30 2003 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | 4/4 |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 9/30/2003 date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office    ETV6    mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION



SEP 30 2003

| | | |
|---|---|---|
| HOUSING AUTHORITY RISK RETENTION GROUP, INC., | ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | No. 02 C 4474 |
| CHICAGO HOUSING AUTHORITY, | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff insurer seeks a declaration that it has no duty to provide a defense to Defendant, the Chicago Housing Authority ("CHA") in a lawsuit filed by current and former tenants against the CHA in state court. Plaintiff Housing Authority Risk Retention Group ("HARRG") provided commercial general liability coverage to the Chicago Housing Authority ("CHA") from 1987 until 1998. On or about October 20, 1999, a large number of current and former tenants of a CHA public housing development known as "Altgeld Gardens" brought an action against CHA seeking damages for alleged bodily injuries resulting from alleged exposure to environmental contamination at or around the development. HARRG filed this action against CHA seeking a declaratory judgment that it has no duty to defend or to indemnify CHA with respect to the underlying litigation on the ground that the claims asserted in that litigation are not covered by the parties' policies.[1] Both parties now move for judgment on the pleadings.

In a motion for judgment on the pleadings, the court considers the pleadings alone, which consist of the complaint, the answer, and any written instruments attached as exhibits. FED. R. CIV.

---

[1] In its corrected answer, CHA asserted as affirmative defenses that HARRG's claims are barred by the doctrine of waiver, the equitable doctrine of laches, and the equitable doctrine of estoppel. (Defendant's Corrected Answer to Plaintiff's Complaint for Declaratory Judgment.) CHA did not raise these defenses in its own motion for judgment on the pleadings or in its response to HARRG's motion, however, and the court deems these defenses waived.

4/4

P. 12(c); *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citations omitted). Where the defendant brings the Rule 12(c) motion, the court will grant it if "it appears beyond all doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id.* at 452 (citations omitted). Where the plaintiff moves for judgment on the pleadings, "the motion should not be granted unless it appears beyond doubt that the non-moving party cannot prove facts sufficient to support his position." *All Am. Ins. Co. v. Broeren Russo Const., Inc.*, 112 F.Supp.2d 723, 728 (C.D. Ill. 2000) (citation omitted). For the reasons stated below, Plaintiff's motion for judgment on the pleadings is granted and Defendant's motion is denied.

## FACTUAL BACKGROUND

The Housing Authority Risk Retention Group ("HARRG") is a risk retention group whose members consist of various housing authorities throughout the United States. (Complaint for Declaratory Judgment (hereinafter "Compl.") ¶ 2.) The Chicago Housing Authority ("CHA") is a municipal corporation which administers low-income housing programs in the City of Chicago. (*Id.* ¶ 3.) From June 1, 1987 until July 31, 1998, HARRG provided commercial general liability coverage to CHA under separate annual policies on an annual coverage period basis (collectively, "the Policies"). (*Id.* ¶ 6.) Among other coverage, the Policies provided coverage for "bodily injury" liability subject to a limit of $5 million per occurrence and in the aggregate. (*Id.* ¶ 7.) Under each of the Policies, CHA was responsible for a self-insured retention of $500,000. (*Id.* ¶ 8.) Moreover, with the exception of the 1987 policy, each of the Policies excluded "'[b]odily injury' . . . arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured . . . ."[2] (*See, e.g.*, 1988 Policy, Ex. A to Compl.,

---

[2] The 1987 policy contained substantially similar language, specifically excluding "[l]iability arising out of the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants [a]t or from premises owned, leased to or occupied by the Authority." (1987 Policy,
(continued...)

at 17.)

On or about October 20, 1999, several thousand current and former tenants of the Altgeld Gardens development, located at 940 East 132nd Street, Chicago, Illinois, during the period 1975 to the present,[3] brought an action against CHA in the Circuit Court of Cook County captioned *Aaron et al. v. Chicago Housing Authority*, case number 99 L 11738, seeking damages for alleged injuries resulting from alleged exposure to environmental contamination at or around Altgeld Gardens (hereinafter the "Underlying Litigation"). (*Id.* ¶¶ 9-10.) Plaintiffs in the Underlying Litigation have filed five amended complaints (the last of which deals only with defendant Commonwealth Edison) alleging negligence, breach of contract, and conspiracy against CHA. (Defendant's Corrected Answer to Plaintiff's Complaint for Declaratory Judgment (hereinafter "Corrected Ans.") ¶ 12.) Plaintiffs assert that CHA built the Altgeld Gardens housing development "in an industrialized area, in and around a former sewage waste site," (Fourth Amended Complaint to *Aaron et al. v. Chicago Housing Auth.* (hereinafter, "*Aaron* FAC"), Ex. 5 to Defendant's Corrected Answer to Plaintiff's Complaint for Declaratory Relief ¶ 7), that CHA "knew that certain contaminants, toxic substances and chemicals, including but not limited to PCBs, PAHs, selenium, arsenic, lead, mercury and pesticides were introduced, released and allowed to remain in the environment in Altgeld Gardens by the surrounding industrial plants, abandoned factories, toxic waste dumps, landfills and a Metropolitan Sanitary District plant, and their agents and employees," (*id.* ¶ 24), that CHA "caused and was responsible for introducing, releasing and allowing PCBs and PAHs to remain in the environment in Altgeld Gardens," (*id.* ¶ 25), and that CHA failed to "advise, warn or educate the

---

[2](...continued)
Ex. A to Compl., at 7.)

[3] The Fourth Amended Complaint in the Underlying Litigation does not indicate the significance of the year 1975 to the litigation.

3

Plaintiffs of the full nature and extent of the presence and existence of the PCB[s] and PAHs[,] the risks associated with such, or the precautions that the Plaintiffs could take." (*Id.* ¶ 27.)

The Fourth Amended Complaint asserts four claims: In Count I, Plaintiffs assert that CHA was negligent in introducing PCBs to Altgeld Gardens, in failing to test for and clean up PCBs and PAHs, and in failing to handle PCBs properly; as a result, the Aaron plaintiffs seek damages for bodily injury in excess of $50,000 for each plaintiff, and injunctive relief in the form of relocation of current residents. (*Id.* ¶ 31.) In Count II, they contend that CHA breached its lease agreement provisions to provide plaintiffs with living space "in decent, safe and sanitary condition" and to keep the development "in a clean and safe condition," as a result, they and seek to recoup rent. (*Id.* ¶¶ 70-71, 73.) In Count III, they aver that CHA conspired with the Illinois Environmental Protection Agency and the Department of Housing and Urban Development to conceal the extent of the dangers to the plaintiffs' health and safety from the contaminants, thereby causing them to suffer bodily injury or to be exposed to increased risk of bodily injury. (*Id.* ¶ 21926-36.) Count IV, alleging negligence, seeks damages for bodily injury and is substantially similar to Count I. (*Id.* ¶ 35.)

On a date not specified, CHA requested that HARRG provide a defense and indemnity with respect to the Underlying Litigation, and HARRG responded by letter on March 10, 2000 stating its rights were "expressly reserved" and "making no commitments to provide coverage for the claims presented" pending further investigation of the matter. (Id. ¶ 11; Ex. B to Compl., at 1.) CHA's defense costs in the Underlying Litigation have exceeded $500,000. (Id. ¶ 13.) By letter on January 24, 2002, HARRG denied coverage in the Underlying Litigation based on the fact that the $500,000 self-insured retention in each policy must be aggregated before the duty of defense and indemnity are triggered and on the pollution exclusion language in each of the Policies. (Compl. ¶¶ 14-15; Ex. D to Compl, at 9.) On a date not specified, CHA advised HARRG that it intends to contest HARRG's denial of coverage. (Compl. ¶ 16.) This declaratory judgment action followed.

4

## DISCUSSION

**Applicable Legal Standards**

In their motions for judgment on the pleadings, the parties dispute a number of issues. As a threshold matter, the parties dispute which law the court should apply. CHA claims the 1987 Policy includes a choice of law provision requiring application of Vermont law, (Reply in Support of Defendant's Motion for Judgment on the Pleadings (hereinafter "Def.'s Reply Mem."), at 1-2), while HARRG contends that the choice of law provision appears in "an entirely separate agreement" and that Illinois law governs in this diversity case. (Plaintiff's Reply in Support of Motion for Judgment on the Pleadings (hereinafter "Pl.'s Reply Mem."), at 5-8). The court need not resolve this dispute, however, for analysis under either Illinois or Vermont law leads to the same outcome, and thus, the court will discuss the laws of both states.

In construing an insurance policy, the court "must ascertain and give effect to the intention of the parties as expressed in their agreement." *Am. Nat'l Fire Ins. Co. v. Nat'l Union Fire Ins. Co.*, ___ N.E.2d ___, No. 1-01-4000, 2003 WL 22070507, *8 (Ill. App. 1st Dist. Sept. 5, 2003) (citation omitted); *cf. Smith v. Nationwide Mut. Ins. Co.*, 830 A.2d 108, 113 (Vt. 2003) ("An insurance contract is construed according to its terms and the evident intent of the parties as expressed in the policy language.") (citation omitted). Terms utilized in the policy language "are accorded their plain and ordinary meaning." *Am. Nat'l*, 22070507, at *8 (citation omitted), *cf. Smith*, 830 A.2d at 113 ("Disputed terms are assigned their plain, ordinary, and popular meaning.") (citation omitted). Any ambiguities in the policy language must be construed in favor of the insured. *Id.*

An insurer's duty to defend is much broader than its duty to indemnify. *Mount Vernon Fire Ins. Co. v. Heaven's Little Hands Day Care*, ___ N.E.2d ___, No. 1-02-1771, 2003 WL 21998618, * 4 (Ill. App. 1st Dist. Aug. 22, 2003) (citation omitted); *Davis v. Liberty Mut. Ins. Co.*, 19 F.Supp.2d 193, 202 (D. Vt. 1998) (citation omitted). The duty to defend arises if any claim against the insured

potentially comes within the coverage of the policy. *Heaven's Little Hands*, 2003 WL 21998618, at * 4 (citation omitted); *Davis*, 19 F.Supp.2d at 202 (citation omitted). Whether the insurer has a duty to defend is determined by comparing the allegations contained in the underlying claim to the policy language. *Heaven's Little Hands*, 2003 WL 21998618, at * 4 (citation omitted); *Davis*, 19 F.Supp.2d at 202 (citation omitted). The burden is on the insurer to show that the claims against it are "entirely excluded" from coverage. *Davis*, 19 F.Supp.2d at 202; *cf. Am. Alliance Ins. Co. v. 1212 Restaurant Group, L.L.C.*, 276 Ill.Dec. 642, 647, 794 N.E.2d 892, 897 (1st Dist. 2003) ("The burden is on the insurer to show that a claim falls within a provision that limits or excludes coverage.") If the insurer owes no duty to defend, then it owes no duty to indemnify. *Am. Family Mut. Ins. Co. v. Enright*, 334 Ill.App.3d 1026, 1029, 269 Ill.Dec. 597, 781 N.E.2d 394, 397 (2d Dist. 2002). In Illinois, at least, If the underlying complaints allege multiple theories of recovery against the insured, the insurer has the duty to defend "even if only one such theory is within the potential coverage of the policy." *Nat'l Union Fire Ins. Co. v. Glenview Park*, 158 Ill.2d 116, 124-25, 198 Ill.Dec. 428, 632 N.E.2d 1039, 1043 (1994).

**Pollution Exclusion**

The threshold question for Count I (negligence), Count III (conspiracy), and Count IV (negligence) of the Fourth Amended Complaint in the Underlying Litigation is whether the Policies' pollution exclusion language bars coverage with respect to claims for bodily injury in the Underlying Litigation. The parties dispute the significance of the term "at or from" within the language "dispersal, seepage, migration, release or escape of pollutants [a]t or from any [CHA] premises, site or location" in the Policies' pollution exclusion. (*See, e.g.*, Pl.'s Reply Mem., at 3; Defendant's Response to Plaintiff's Motion for Judgment on the Pleadings (hereinafter "Def.'s Resp. Mem."), at 5-6.) CHA claims the term "at or from" means the pollution exclusion does not apply to "contaminants which have their origin or source elsewhere and contaminate the premises through

6

the actions of persons other than the CHA." Thus, CHA contends, those claims relating to contaminants that originated outside of the CHA property should be covered by the Policies. (*See* Defendant's Memorandum in Support of Motion for Judgment on the Pleadings (hereinafter "Def.'s Mem."), at 8). HARRG' argues, tot he contrary, that the policy language at issue constitutes an "absolute pollution exclusion" which applies regardless of the origin of the pollution or the identity of the polluter.[4] (Pl.'s Reply Mem., at 2-4.)

The case law supports Plaintiff's interpretation of the policy language as an "absolute pollution exclusion." *See Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 (2nd Cir. 1999) ("Each of [insurer's] policies contains an 'absolute pollution exclusion,' which excludes all coverage for '[l]iability of the Insured arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . at or from premises owned or occupied by or rented to the Insured.") (applying Vermont law); *Am. States Ins. Co. v. Koloms*, 177 Ill.2d 473, 476-77, 227 Ill.Dec. 149, 687 N.E.2d 72, 74 (1997) (noting that language excluding "'Bodily injury' . . . arising out of actual, alleged or threatened discharge, dispersal, release or escape of pollutants [a]t or from premises you own, rent or occupy" is commonly known as the "absolute pollution exclusion"). In a handful of cases, courts have examined the issue presented here: whether the absolute pollution exclusion bars coverage of all claims for pollution, whether or not the contaminants originated on the insured's property. These authorities (albeit none, to this court's knowledge in Illinois or Vermont) have concluded that the exclusion does bar coverage in such circumstances.

*Gregory v. Tennessee Gas Pipeline Company*, 948 F.2d 203 (5th Cir. 1991), is instructive. In *Gregory*, the adjoining landowners to a man-made reservoir, occupied by the City of

---

[4] The "absolute pollution exclusion" was inserted into standard form comprehensive general liability policies beginning in 1985. *Hatco Corp. v. W.R. Grace & Co.-Conn.*, 801 F. Supp. 1334, 1352-53 (D.N.J. 1992), citing Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 CORNELL L. REV. 610, 633 (1990).

7

Natchitoches, Louisiana, brought suit against the city for bodily injury and property damage resulting from the presence of PCBs in the water. The contamination apparently resulted from discharges into the lake from a neighboring facility owned by a gas company. In response to the lawsuit against it, the city filed a third-party declaratory judgment action against its commercial general liability insurer alleging that the insurer owed it coverage and the duty to defend in the underlying actions. Defendant insurer invoked policy language similar to the language at issue here: The policy excluded "damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . [a]t or from premises you own, rent or occupy . . . ." *Id.* at 206. The city urged that the alleged discharge of pollutants occurred not "at or from" the city-owned lake, but rather from the gas company facility and gas pipelines "*above* the waters," but the court was unpersuaded. Noting that the plaintiffs in the underlying litigation had alleged only that their use of the lake caused their bodily injury and property damage, the court concluded that the claims against the city arose solely from pollutants at or from the lake. *Id.* at 206-07.

Similarly, in *East Quincy Servs. Dist. v. Continental Insurance Company*, a seller of residential property sought a declaration that its liability insurer was required to defend and indemnify it in a suit brought by purchasers of the property which was contaminated by E. coli and other bacteria, possibly from the septic tanks and leachfields of surrounding homes. 864 F. Supp. 976, 977 (E.D. Cal. 1994). The policy excluded coverage for "'[b]odily injury' . . . arising out of the actual, alleged or threatened emission, discharge, dispersal, seepage, migration, release or escape of 'pollutants' . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by . . . any insured . . ." *Id.* at 979. Plaintiff insured argued, as CHA does here, that the pollution exclusion did not apply to the underlying litigation because the pollution originated off-site. *Id.* at 980. The court found, however, that the language of the exclusion included pollution "at" as well as "from" the site, so that there was "no limiting language as to the origination of the pollution." *Id.* The court characterized the insured's argument to the contrary as "sophistry," citing *Gregory*,

8

948 F.2d at 206, and observed that Plaintiff insured did not contest that the pollution was "at the site." *Id.*

Finally, HARRG cites *Legarra v. Federated Mutual Ins. Co.*, 35 Cal.App.4th 1472, 1476, 42 Cal.Rptr.2d 101, 103 (1995). There, individual property owners brought a declaratory action seeking to establish their insurer's duty to defend and indemnify them in connection with a demand by the California Regional Water Quality Control Board for certain response costs due to groundwater contamination on their property. The policy contained an exclusion nearly identical to the ones at issue in *Gregory, East Quincy*, and here: it carved out any coverage for "'[b]odily injury' . . . arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . [a]t or from premises owned, rented or occupied by the named insured . . . ." *Id.* at 1477. The insured property owners contended that the exclusion applied only if the pollution originated on the insured's property, and that since the groundwater contamination was caused by sources off their property, the pollution exclusion did not apply. *Id.* at 1480. The court rejected this contention, finding that the "at or from" language did not "speak to the origin of the pollution" and, since the claim related to pollution "at" the site, the exclusion applied. *Id.*

Although neither Illinois nor Vermont courts appear to have addressed the question whether the absolute pollution exclusion bars coverage for pollution that originates off the insured's premises, courts in both states have enforced such an exclusion. In *Maska*, the insured claimed that the insurance policy covered a suit against it for environmental contamination brought by the Vermont Department of Environmental Conservation for contamination due to wastewater discharges observed during a routine inspection. 198 F.3d at 76. The court noted that the policy contained the absolute pollution exclusion covering pollution "at or from" the insured's premises. *Id.* at 78. The court held that such a pollution exclusion clause did not violate Vermont public policy. *Id.* at 84. In *Kim v. State Farm Fire and Casualty Company*, a cleaning company sought a declaratory judgment that its insurer had breached its duty to defend and indemnify after the

insured settled an action for damages brought by the insured's landlord resulting from the release of tetrachloroethane (perc) by one of the insured's machines onto the floor and into the underlying soil of the premises. 312 Ill.App.3d 770, 771, 245 Ill.Dec. 448, 728 N.E.2d 530, 531 (1st Dist. 2000). The court found that the language in the policy stating that the absolute pollution exclusion clause excluding "property damage . . . arising out of the actual, alleged or threatened discharge, seepage, migration, dispersal, spill, release or escape of pollutants" barred coverage for injuries caused by "'traditional environmental pollution,' that is, hazardous material discharged into the land, atmosphere, or any watercourse or body of water." Id. at 776, citing Koloms, 177 Ill.2d at 488-94; see also Economy Preferred Insurance Company v. Grandadam, the court 275 Ill.App.3d 866, 212 Ill.Dec. 190, 656 N.E.2d 787 (3d Dist. 1995) (finding that absolute pollution exclusion precluded coverage for damage and injuries caused when insured spilled container of mercury in neighbor's home).

The only authority CHA cites to support its position is, in this court's view, inapposite. The policy at issue in Agency of Natural Resources v. United States Fire Insurance Company did not contain an absolute pollution exclusion; instead it excluded insurance coverage for the costs of a state-directed clean-up of pollutants. 173 Vt. 302, 304, 796 A.2d 476, 477 (2001). State of Vermont v. CNA Ins. Co., 172 Vt. 318, 779 A.2d 662 (2001) was an action by the State of Vermont to determine whether its insurance carrier was responsible for damages arising from environmental contamination of a state prison site. The court had no occasion to construe the pollution exclusion in the policy: "Starting in 1984, the policies included a pollution exclusion, and the State represents that it has not claimed coverage for any period after 1984." Id. at 321, 779 A.2d at 665. In Koloms, the court found that the alleged accidental release of carbon monoxide by a broken furnace did not constitute "traditional environmental pollution" contemplated by the absolute pollution exclusion clause. 177 Ill.2d at 494, 687 N.E.2d at 81. CHA's protestations notwithstanding, it is clear that the type of pollution alleged in the Underlying Litigation here does constitute "traditional

10

environmental contamination," i.e., the "gradual or repeated discharge of hazardous substances into the environment," rather than contamination of the sort involved in Koloms.[5] See id. at 493 (citations omitted).

In the Underlying Litigation, the plaintiffs claim to have been injured by hazardous materials that were "introduced, released and allowed to remain in the environment in Altgeld Gardens by the surrounding industrial plants, abandoned factories, toxic waste dumps, landfills and a Metropolitan Sanitary District plant," (Aaron FAC ¶ 24), and by PCBs and PAHs that CHA introduced, released, and allowed to remain in the environment of Altgeld Gardens. (Id. ¶ 25.) The clause within each of the Policies excluding "'[b]odily injury' . . . arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured" is identical or nearly identical to so-called "absolute pollution exclusion" as defined by the case law from other courts. The court concludes that, under both Vermont and Illinois law, the absolute pollution exclusion bars coverage for bodily injuries resulting from exposure to pollution, regardless of origin.

**Vermont Policy Filing Requirement**

CHA contends that, even if the exclusionary language bars coverage, the court cannot rule on HARRG's motion for judgment on the pleadings because a key piece of evidence is necessarily missing from the pleadings: whether HARRG properly filed the Policies with, and obtained approval from, the Vermont Department of Banking and Insurance ("VDBI"). (Def.'s Resp. Mem., at 12-14.) Vermont law provides that "[n]o basic insurance policy, certificate or annuity contract form . . . shall be delivered, or issued for delivery in this state, unless the form has been filed with and approved by the commissioner" of the VDBI. Vt. Stat. Ann. tit. 8, § 3541(a). CHA contends

---

[5] Similarly, the remaining cases CHA cites that do not involve traditional environmental pollution are also inapposite. (See Def.'s Resp. Mem., at 9-11.)

11

that Vermont courts will void a pollution exclusion from a policy that has not been properly filed with the VDBI. Because HARRG has not and, indeed, "cannot in a Rule 12(c) motion, demonstrate that the policies at issue were filed and approved by the commissioner of VDBI," CHA contends, the court must deny HARRG's motion for judgment on the pleadings. (Def.'s Resp. Mem., at 13.)

The *Maska* court addressed a similar argument. Plaintiff there urged that the exclusions in the insurer's policies were invalid because the insurer had not timely filed its policy forms with VDBI. See *Maska*, 198 F.3d at 78. The court found some support for plaintiff's contention in Vermont law. *Id.* at 78 n.7. For example, in *Vermont American Corp. v. American Employers Insurance Company*, the court found that "[i]t would be unreasonable to allow insurers to benefit from a failure to comply with Vermont insurance regulations or a failure to prove that the exclusions were properly filed. The court, therefore, will not void the entire policy but will conclude the pollution exclusions are void." No. 330-6-95 WnCy, slip op. at 4 (Vt. Super. Ct. Washington County Oct. 31, 1997). Likewise, in *Agency of Natural Resources v. Glens Falls Insurance Company*, the court held that an agreement between the state and a private insurance carrier to share costs of cleaning up petroleum contamination was void because the Vermont statute that authorized state expenditures for petroleum clean-up covered only "uninsured cleanup costs." 169 Vt. 426, 430, 736 A.2d 768, 771 (1999). The court assumed that the relevant policies covered environmental cleanup costs, despite several pollution exclusion clauses, because the carrier had not obtained timely approval of the exclusions from VDBI. *Id.*

As the court in *Maska* pointed out, however, the *Glens Falls* court did not discuss whether failure to file with the VDBI automatically nullified a disputed policy exclusion. See 198 F.3d at 78 n.7. The *Maska* court noted that most other courts that had considered this question had declined to invalidate the exclusion clauses merely because the insurer failed to obtain regulatory approval, and the court was "not convinced that the Vermont Supreme Court, if the issue were squarely presented, would declare a particular exclusion invalid–while enforcing the remainder of the

12

policy–based on the insurer's failure to file policy forms with VDBI." *Id.* (citations omitted). The *Maska* court itself declined to decide the matter, on the basis that plaintiff had not properly preserved its argument for appeal. *Id.* at 78.

HARRG objects that section 3541, in any event, is not applicable to HARRG because it is a risk retention group and therefore "exempt from any state law, rule, regulation, or order," including filing policy forms with state insurance commissioners. (Pl.'s Reply Mem., at 11.) Even if section 3541 does apply to HARRG, it contends, CHA has provided no evidence that HARRG's policies were not filed in accordance with the statute. (*Id.* at 10-11.) Nevertheless, the court will grant leave to CHA to amend its pleadings within ten days if it can in good faith assert that HARRG is both subject to the Vermont insurance statutes and has not timely filed the Policies with the VDBI. If CHA does so, the court expects the parties to brief the issue of whether failure to file the policies with VDBI voids them, or simply renders certain provisions–for example, the pollution exclusion–unenforceable.[6]

**Contract and Lease Claims**

In Count II of the Underlying Litigation, the plaintiffs alleged that CHA breached contracted and lease obligations to the plaintiffs. HARRG argues that it has no duty to defend CHA from these claims because they do not meet the definitions of "bodily injury" or "occurrence," as set forth in the policies. (Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment on the Pleadings (hereinafter "Pl.'s Mem."), at 13.) According to the Policies, "'Bodily Injury' means bodily injury, sickness or disease, mental anguish or mental injury, sustained by a person, including

---

[6] Defendant also points out that the plaintiffs in Count III of the underlying litigation allege that the "conspiracy" began on November 2, 1998, after CHA had cancelled its HARRG policies. (*Aaron* FAC ¶ 21936.) If CHA amends its pleading pursuant to this opinion, the court expects the parties to brief this contention, as well.

13

death resulting from any of these at any time,"[7] (See, e.g., 1988 Policy, at 6), while "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which causes 'bodily injury' or 'property damage.'"[8] (See, e.g., 1988 Policy, at 10.) HARRG cites *Travelers Ins. Cos. v. P.C. Quote, Inc.*, in which the plaintiff, a general liability insurer won a declaration that it had no duty to defend the insured in a breach of contract action brought by an unpaid supplied. The *P.C. Quote* court addressed the question whether the breach of contract involved an "occurrence," defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 211 Ill.App.3d 719, 725, 570 N.E.2d 614, 618 (1st Dist. 1991). In *P.C. Quote*, the insured's employee had ordered computers without authority, and the insured subsequently refused to pay for the computers, and the vendor sued the insured. *Id.* at 722. The court concluded that the breach of contract was "intentional," not "accidental," and thus did not constitute an "occurrence" so that the insurer had no duty to defend. *Id.* at 728.

CHA points out that the complaints in the Underlying Litigation make no mention of whether CHA intentionally breached its leases with the plaintiffs. (*See Aaron* FAC ¶ 70.) Although CHA is correct that the portion of the complaint in the Underlying Litigation does not specifically claim an "intentional" breach of contract on CHA's part, the claim is clearly premised on intentional conduct by CHA:

> Despite . . . CHA's knowledge of the danger and risk and the potential for severe and permanent injury . . . CHA . . . willfully and fraudulently concealed from the

---

[7] The 1987 policy contained substantially similar language, "'Bodily Injury' means bodily injury including mental distress, sickness or disease, and death resulting therefrom, and also includes care and loss of services by any person or persons." (1987 Policy, at 4.)

[8] The 1987 policy contained substantially similar language, "'Occurrence' . . . means an accident or event which . . . results in Bodily Injury . . . neither expected nor intended from the standpoint of the Insured and . . . all injuries or damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one Occurrence." (1987 Policy, at 4.)

14

> Plaintiffs . . . the nature of the conduct of . . . CHA, the dangers and risks related to the presence of and exposure to the PCBs and PAHs, and the causative relationship between . . . CHA's acts and omissions and the damages suffered by the Plaintiffs.

(*Id.* ¶ 74.) It thus does not appear that plaintiffs in the Underlying Litigation have brought a breach of contact claim based on an "accidental" concealment of dangerous conditions as required by the Policies' definition of "occurrence."

CHA also contends that HARRG is not entitled to judgment on the pleadings because it made no reference to the breach of contract claim in its complaint. (Def.'s Resp. Mem., at 14.) The court notes, however, that HARRG did mention that the plaintiffs in the Underlying Litigation had brought three causes of action in their Third Amended Complaint–negligence, breach of contract, and conspiracy, (Compl. ¶ 12), and CHA admitted as much. (Corrected Ans. ¶ 12.) HARRG also noted that, in its January 24, 2002 letter, it "denied a duty to defend CHA *on a number of bases*" (Compl. ¶ 14) (emphasis added) and "denied a duty of defense and indemnity . . . by virtue of, *among other grounds*, the pollution exclusions. (Compl. ¶ 15 (emphasis added).) Finally, HARRG prayed that this court declare it was under no duty or obligation to defend or indemnify CHA with respect to the Underlying Litigation "on the grounds that the claims asserted in the Underlying Litigation are not covered by the HARRG Policies." HARRG thus did not limit its complaint solely to claims relating to bodily injury, but presumptively included all claims relating to the underlying litigation in its complaint.

**HARRG's Remaining Defenses**

The court need not reach HARRG's remaining defenses. CHA contends that HARRG erred in its January 24, 2002 letter when it stated that the fact that the $500,000 self-insured retention in each Policy must be aggregated before the duty of defense and indemnity are triggered. (*See* Pl.'s Mem., at 11-13.) HARRG has also argued that all of the claims against CHA for contaminants that originated elsewhere were dismissed with prejudice by the presiding judge on December 27,

2000. (*See* Pl.'s Resp. Mem., at 2-6; Ex. A to Pl.'s Resp. Mem.) CHA contends that HARRG's argument was based on the First Amended Complaint in the Underlying Litigation, and that the claims involving contaminants originating off-site appear in the Fourth Amended Complaint. (*See* Def.'s Reply Mem., at 4-5.) Although it is not clear from the record to which version of the complaint the December 27 order applied, the court need not resolve this issue, either, because it has concluded that the negligence and conspiracy claims against CHA in the Underlying Litigation are barred by the absolute pollution exclusion and that the breach of contract claim falls outside the scope of the policy.

Assuming they are valid, the Policies preclude coverage of all claims in the Underlying Litigation.

## **CONCLUSION**

Because the negligence and conspiracy claims against CHA in the Underlying Litigation involve claims for bodily injury, they are barred by the absolute pollution exclusion clauses of the Policies between the parties. The breach of contract claim alleges intentional acts on the part of CHA and thus is not an "occurrence" covered by the policy. For these reasons, the court grants HARRG's motion for judgment on the pleadings (Doc. 17-1), denies CHA's motion for judgment on the pleadings (Doc. 16-1), and grants CHA leave, within ten days, to submit an amended answer alleging that the Policies have not been validly filed, if it so chooses.

ENTER:

Dated: September 30, 2003

REBECCA R. PALLMEYER
United States District Judge